UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
GEORGETTE MORTELLARO,

              Plaintiff,               <u>MEMORANDUM & ORDER</u>
                                       19-CV-4868(JS)

    -against-

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.
--------------------------------X
APPEARANCES
For Plaintiff:       Howard D. Olinsky, Esq.
                  Olinsky Law Group
                  250 South Clinton Street, Suite 210
                  Syracuse, New York 13202

For Defendant:       Mary M. Dickman, Esq.
                  United States Attorney's Office
                  610 Federal Plaza, 5th Floor
                  Central Islip, New York 11722

SEYBERT, District Judge:

        Georgette Mortellaro ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of her application for Social Security Disability Insurance Benefits by the Commissioner of Social Security (the "Commissioner"). (<u>See generally</u> Compl., ECF No. 1.) Presently pending before the Court are the parties' cross-motions for judgment on the pleadings. For the following reasons, Plaintiff's motion (Pl. Mot., ECF No. 8) is GRANTED, and the Commissioner's motion (Comm'r Mot, ECF No. 13) is DENIED.

<u>BACKGROUND</u>[1]

I.   <u>Procedural History</u>

On December 15, 2015, Plaintiff completed an application for disability insurance benefits ("DIB"), alleging disability as of July 13, 2015, due to neck and back pain, as well as carpal tunnel syndrome. (R. 54.)  After Plaintiff's claim was denied on February 5, 2016, she requested a hearing before an Administrative Law Judge ("ALJ").  (R. 67, 79-80.)  On May 3, 2018, Plaintiff, accompanied by counsel, appeared for a hearing before ALJ David J. Begley (the "Hearing").  (R. 11-21.)  Suman Srinivasan, a vocational expert ("VE"), also testified at the Hearing. (R. 11, 47-51.)

In a decision dated July 30, 2018, the ALJ found that Plaintiff was not disabled. (R. 21.)  On June 25, 2019, the Social Security Administration's Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 1-7.)

Plaintiff initiated the instant action on August 26, 2019 (see Compl.) and moved for judgment on the pleadings on

---

[1] The background is derived from the administrative record filed by the Commissioner on December 9, 2019. (See ECF No. 7.)  For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.  The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.  Hereafter, the administrative record will be denoted "R.".

February 7, 2020 (Pl. Mot.; Pl. Support Memo, ECF No. 8-1). After receiving several extensions of time to do so, the Commissioner filed a cross-motion for judgment on the pleadings on September 3, 2020. (Comm'r Mot., ECF No. 13; Comm'r Support Memo, ECF No. 13-1.) Plaintiff and the Commissioner filed their reply briefs on September 24, 2020 and November 6, 2020, respectively. (Pl. Reply, ECF No. 14; Comm'r Reply, ECF No. 17.)

## II. Evidence Presented to the ALJ

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to Plaintiff's medical records and the vocational expert's testimony.

### A. Testimonial Evidence and Employment History

At the time of the Hearing, Plaintiff was forty-four years old. (R. 35.) She completed trade school where she learned bookkeeping. (R. 38.) She is right-handed, five feet and ten inches tall, and 220 pounds. (R. 35.) Plaintiff testified that she had been unable to work since July 13, 2015 due to a work-related incident. (R. 36.) At the time of the accident, she was an independent real estate agent but primarily appraised houses rather than conducting sales. (R. 36.) After the accident, Plaintiff did not try to find any work. (R. 36-37.) She testified that she is "useless" and unable to work because she cannot type, sit, or stand for long periods of time and gets daily headaches. She has been getting headaches since 2013, at which time she was

3

involved in her first car accident.  (R. 37, 44.)  Her neck gives her the most pain and during a flare-up, her neck throbs and the pain travels into her head, arms, and tingles in her fingers. (R. 43.)  These flare-ups can occur when Plaintiff does not have support on her neck and when the weather is cold or rainy.  (R. 44.) She had a cervical fusion for her neck in April 2017; however the pain worsened.  (R. 44.)  Plaintiff testified that "there is nothing [her physicians] can do" for her at this point except for pain management.  (R. 44.)  She uses a heating pad and takes medication, which provides her some relief.  (R. 44-45.)  She is most comfortable lying down and typically rests on her couch which supports her neck and has an ottoman.  (R. 45.)

Plaintiff is married with a teenage daughter and the family lives in a ranch-style home with two dogs.  (R. 37-38.) Plaintiff has a driver's license but indicated that she only drives to pick up her medication; her husband drove her to the Hearing. (R. 38.)  She avoids driving because "[she's] done" if she "mov[es] [her] head and if someone jerks or brakes."  (R. 38.)  She also does not have any income; her husband is the provider, including health insurance.  (R. 39.)  Plaintiff regularly sees a pain management physician, a neurologist, and her primary care provider, Dr. Brown.  (R. 39-40.)  The medication Plaintiff takes causes drowsiness, blurred vision, and hives.

On a typical day, Plaintiff wakes up, makes a cup of coffee, then takes ibuprofen, allergy medicine, and medicine for her stomach.  (R. 40.)  She then sits on the couch, puts a heating pad on her neck and back, and watches the news.  (R. 40.)  She does "physical therapy at home, exercise[s]," and then takes her pain medication, at which point she falls asleep.  (R. 40.)  After she wakes up, she sits on the couch and uses a heating pad again, then "tr[ies] to do some things around the house."  (R. 40-41.)  She is unable to do essentially all of the chores she used to perform and cannot clean the house, bathroom or dishes.  (R. 41.)  She can only do "things that are . . . hand level," such as wiping the countertops.  (R. 41.)  Her husband or daughter do the grocery shopping.  (R 41.)  Plaintiff's daughter also does the laundry, something Plaintiff has not been able to do since 2015.  (R. 41.)  After chores, Plaintiff then goes back to the couch, uses the heating pad, takes another pain medication, and falls back to sleep.  (R. 41-42.)  Her naps during the day last approximately two hours and cause her to wake up at 3:00 a.m., at which time she begins her day.  (R. 41-42.)  She also has difficulty sleeping at night because of her nerves and neck.  (R. 42.)

Plaintiff is able to bathe herself and has a computer at home, which she uses only to check email.  (R. 41.)  To occupy her time during the day, she listens to music and watches television.  (R. 42.)  She does not belong to any groups, clubs, or

5

organizations and does not attend religious services or volunteer anywhere. (R. 42.)  Her friends and sister travel to her house to visit.  (R. 43.)  Plaintiff did take a vacation to Florida in February 2018 and traveled there via plane.  (R. 43.)  She stated that she had to "drug [herself] up" for the trip.  (R. 43.)  She smokes one pack of cigarettes over a three-day period and sometimes drinks.  (R. 43.)  As to her limitations, Plaintiff can only sit and stand for 10 to 20 minutes on a good day or 5 to 10 minutes on a bad day.  (R. 45-46.)  She can walk about two blocks and lift less than five pounds.  (R. 45-46.)  If she lifts weight any heavier than that, she strains her neck and it begins to throb. (R. 46.)  She also has problems using her hands and fingers, with more issues on her left side which were caused by carpal tunnel and her neck.  (R. 46.)  She cannot type because her hand cramps up rendering her unable to move her fingers.  (R. 46.)  This also causes her to be unable to go to the bathroom at times.  (R. 46.)

B.   Medical Evidence

Plaintiff was involved in an automobile accident in April 2013.  (R. 36, 300.)  She experienced mild and aching neck and back pain as a result of the collision and sought treatment from several physicians at Orlin & Cohen Orthopedic Associates ("Orlin & Cohen").  (R. 412.)  She presented to Dr. Joseph A. Cardinale, M.D., an orthopedist and pain management specialist, on January 23, 2014, who diagnosed cervicalgia, cervical

radiculopathy, lumbar radiculopathy, and lumbago. (R. 289.) Dr. Cardinale also referred Plaintiff to a spinal surgeon, Dr. Michael B. Shapiro, M.D., whom she saw on February 17, 2014. (R. 289-92.) Dr. Shapiro also assessed Plaintiff with lumbago and cervical radiculopathy, and sent Plaintiff for an MRI to evaluate possible surgery. (R. 292.) The MRI was conducted on February 19, 2014 and showed a focal posterior disc herniation indenting the thecal sac, without impingement, at C3-C4; a broad-based disc bulge, slightly flattening the ventral subarachnoid space, at C4-C5; and central disc herniation indenting the thecal sac, without compression, at C5-C6. (R. 335.) Upon his review of the MRI results, Dr. Shapiro diagnosed cervicalgia and cervical radiculopathy. (R. 294.) He discussed conservative care, injection therapy, and even surgical intervention should the conservative care be unsuccessful. (R. 294.) On March 3, 2014, Plaintiff met with a third physician from Orlin & Cohen, Dr. Bennett H. Brown. (R. 275.) Dr. Brown diagnosed Plaintiff with bilateral carpal tunnel syndrome, gave Plaintiff injections to treat the carpal tunnel, and told Plaintiff to use NSAIDs as needed.[2] (R. 275.) Plaintiff followed up with Dr. Brown on May 2, 2014, at which time she received an additional round of injections for her carpal tunnel. (R. 279.) Then, Plaintiff saw

---

[2] "NSAID" is a commonly used acronym for "non-steroidal anti-inflammatory drugs."

Dr. Alfred F. Faust, M.D., on May 8, 2014, who determined that Plaintiff had a herniated disc at C5-C6 that was in contact with her spinal cord and triggered hand forearm dysesthesias.  (R. 209.) He assessed a herniated cervical intervertebral disc and advised Plaintiff to consider a disc replacement.  (R. 209.)

In March 2015, Plaintiff treated with Theresa Gentile, a Physician's Assistant ("PA") in Dr. Cardinale's practice.  (R. 314.)  Plaintiff complained of neck and back pain that radiated into her right arm.  (R. 314.)  PA Gentile assessed Plaintiff with cervical radiculopathy and cervicalgia, and administered a cervical epidural steroid injection, as well as a trigger point injection. (R. 316.)  Plaintiff returned to Dr. Brown on July 10, 2015 due to cramping and paresthesias to her hands, accompanied by neck pain and cramping in her upper arms; however, she indicated "some improvement" to her condition following the epidural steroid injection. (R. 281.)  After assessing cervical radiculopathy and carpal tunnel syndrome, Dr. Brown administered a carpal tunnel injection.  (R. 283-84.)

Three days later, on July 13, 2015, Plaintiff was involved in another motor vehicle accident, during which the airbags deployed.  (R. 239.)  She presented to North Shore-LIJ Hospital with neck tenderness, abdominal pain on her right side, and pain in her back, right shoulder, right lower leg, and left wrist.  (R. 239.)  She denied any extremity weakness.  (R. 239.)

Upon examination, she had tenderness in the right upper and lower quadrants of her abdomen as well as her lumbar and cervical spine. (R. 241-42.)   She was fitted with a neck collar, prescribed Percocet, and discharged.  (R. 241-42.)

The following day, Plaintiff saw Dr. Scott Silverberg, M.D., an orthopedist from the Central Orthopedic Group LLP, on "an emergency basis" for a neck and back evaluation. (R. 366.)  Dr. Silverberg noted Plaintiff's herniated disc, as well as her epidural treatments.  (R. 366.)  He also indicated that Plaintiff "did not like the treatment she was getting [at Orlin & Cohen]." (R. 366.) After examining Plaintiff, Dr. Silverberg assessed Plaintiff with cervical and lumbar sprains with radiculitis. (R. 367.) He indicated that Plaintiff "ha[d] gotten quite symptomatic in the neck again," and referred her for an MRI and physical therapy.  (R. 367.)  Plaintiff returned to Dr. Silverberg on July 27, 2015 with significant pain and throbbing in her neck which travelled to her head.  (R. 364.)  Dr. Silverberg determined that Plaintiff had a whiplash injury that was exacerbating her neck pathology, prescribed her Tramadol, and referred her to Dr. Fernando Checo, M.D., for an evaluation of her cervical spine, as well as physical therapy. (R. 364-65.)

Plaintiff's next appointment was with Dr. Cardinale on July 28, 2015 for a "routine follow-up."  (R. 322.)  Plaintiff complained of low back, neck, and head pain that she rated a ten

out of ten in intensity.  (R. 322.)  Her pain radiated to her left
leg and right arm which was exacerbated with sitting, standing,
twisting, walking, bending forward, and extending backwards.  (R.
322.)  Dr. Cardinale assessed cervical radiculopathy, herniated
cervical intervertebral disc, cervicalgia and myalgia, and
administered trigger point injections.  (R. 323.)  Plaintiff then
returned to Dr. Brown two days later, at which point she complained
of cramping and paresthesias to her hands that was always
accompanied by neck pain and cramping in her upper arms.  (R. 285.)
Dr. Brown recommended that Plaintiff undergo carpal tunnel release
surgery, with the right-side to be performed prior to the left.
(R. 287.)

Plaintiff then sought treatment from Dr. Checo on
August 13, 2015 and chiefly complained of neck pain, which was
excruciating and causing her headaches.  (R. 362.)  Upon examining
Plaintiff, Dr. Checo found Plaintiff to have cervical spondylosis
and a cervical neck sprain.  (R. 363.)  He recommended that
Plaintiff go to physical therapy, referred her to Dr. Seema V.
Nambiar, M.D., and advised her to continue using Mobic anti-
inflammatory medication as well as muscle relaxers. (R. 363.)  He
also stated that Plaintiff was to "refrain from any heavy lifting,
bending, twisting, or strenuous activities" and gave her a note
for work.  (R. 363.)  Plaintiff saw Dr. Nambiar on August 25, 2015
for a comprehensive evaluation and pain management options.

(R. 359.)  Plaintiff complained of persistent pain in the neck that radiated into her arms, numbness in her fingers, pain in her legs, as well as headaches and blurry vision.  (R. 359.)  After examining Plaintiff, Dr. Nambiar assessed cervicalgia, cervical disc disease, cervical radiculitis, lumbago, lumbar sprain, and leg pain.  (R. 360.)  She sent Plaintiff for a lumbar spine MRI, prescribed Medrol Dosepak to reduce pain and inflammation in her neck as well as Cambia for headaches, and asked Plaintiff to resume massage therapy.  (R. 360.)  Dr. Nambiar also referred Plaintiff to a neurologist for a concussion and persistent headaches. (R 360.)

On September 21, 2015, Plaintiff was examined by Dr. B. Rao Yadlapalli, M.D., a neurologist.  (R. 375.)  Dr. Yadlapalli reported that Plaintiff had a slight impairment of nerve sensation in both of her hands, mildly restricted cervical and lumbrosacal movements, some paraspinal muscle spasm in the cervical and lumbrosacral area, mild disc degenerative changes in the lumbrosacral spine, and lumbrosacral sprain.  (R. 376.)  He advised Plaintiff to have EMG/nerve conduction studies, to continue with her Tramadol and Flexeril prescriptions, use a wrist splint, take B vitamins, and to continue physical therapy with massage. (R. 376.)

Plaintiff returned to Dr. Cardinale on September 30 and October 28, 2015.  (R. 328, 332.)  During the September visit,

Plaintiff complained of radiating neck and back pain, which she rated as an eight out of ten.  She also indicated that the medication and injection therapy alleviated her pain, which was exacerbated upon physical activity and interfered with her ability to perform household chores.  (R. 328.)  After finding that Plaintiff had decreased range of motion in her neck and back, Dr. Cardinale assessed Plaintiff with lumbar radiculopathy, cervicalgia, and chronic migraines. (R. 330.)  He recommended that Plaintiff remain on her current medication and administered a cervical epidural steroid injection.  (R. 331.)  Then, during the October visit, Plaintiff rated her neck and low back pain a seven out of ten.  (R. 332.)  Dr. Cardinale's findings were largely similar to his findings from September.  He did, however, note that Plaintiff reported "little long lasting relief from injections" and discussed spinal cord stimulation ("SCS") and surgery with her.  (R. 334.)

Plaintiff then followed up with Dr. Checo in November 2015 and maintained her complaint of pain in her neck, back, and arm, as well as pain that radiated down both of her legs.  (R. 355.)  Dr. Checo assessed cervical and lumbar spondylosis, radiculopathy, and muscle sprains.  (R. 356.)  He ordered physical therapy and anti-inflammatory medication, and told Plaintiff to get an electromyography ("EMG") test.  (R. 356.)  Plaintiff saw him again in December 2015 when he reviewed the results of Plaintiff's EMG,

which was negative.  (R. 352.)  At that time, Dr. Checo also administered trigger point injections in Plaintiff's cervical and lumbar spines.  (R. 353.)  Plaintiff did not return to Dr. Checo until February 2016, at which time she still complained of neck and back pain.  (R. 416.)  He reviewed a recent MRI of Plaintiff's which showed central extruded disc C4-6, lumbar lordosis loss, and disc bulge at L4-5.  (R. 417.)  Dr. Checo also referred Plaintiff to Dr. Vandana K. Soni, M.D., for a neurological workup.  (R. 417.)

Prior to seeing Dr. Soni, Plaintiff saw P.A. Jessica Bianculli in March 2016 for an evaluation of her left lower extremity dysesthesias, neck pain, and left upper extremity dysesthesias.  (R. 442.)  Plaintiff told P.A. Bianculli that, in addition to neck pain, she had pain in her left upper arm and numbness in her hands.  (R. 442.)  Plaintiff denied radicular pain, weakness in the bilateral upper extremities, difficulty with fine motor movements, and difficulty dropping things.  (R. 442.)  P.A. Bianculli assessed lumbar degenerative disc disease, left sacroiliac strain, and inflammatory radiculitis.  (R. 444.)  She recommended activity modifications and a CT scan of Plaintiff's cervical spine, and referred her to a rheumatologist.  (R. 444.)

Plaintiff then saw Dr. Soni in April 2016 for an initial neurological evaluation, primarily concerning Plaintiff's increasing headaches which were occurring on a near-daily basis and not being alleviated with over-the-counter medication.  (R.

13

520.)   Dr. Soni also noted Plaintiff's complaints of radiating neck and lower back pain.  (R. 520.)  Dr. Soni performed a "mini-mental status examination" that revealed that Plaintiff had mild attention deficit, secondary to chronic pain and probable medication use.  (R. 521.)  Then, upon physical examination, Dr. Soni found that Plaintiff had decreased range of motion of bilateral shoulders with limited overhead abduction, and guarding of bilateral deltoids, bilateral quadriceps, and left hamstring muscles.  (R. 521.)  Dr. Soni then suggested that Plaintiff undergo an MRI, discontinue Motrin, take Mobic and Lidoderm, and continue physical therapy.  (R. 521.)  Plaintiff, however, did not want to go to physical therapy because it was not covered by insurance. (R. 522.)

Dr. Andrew J. Porges, M.D., a rheumatologist, performed an initial consultation on April 22, 2016.  (R. 418.)  He noted that Plaintiff had marked decreased range of motion in her lumbar spine and shoulders, as well as tender points in her elbow and shoulders that were not "dramatic."  (R. 420-21.)  Dr. Porges assessed fibromyalgia and sent Plaintiff for bloodwork.  (R. 421-22.)  Several days later, Plaintiff returned to P.A. Bianculli, who noted that Plaintiff's symptoms persisted despite activity modifications, modalities, and anti-inflammatories.  (R. 445.) P.A. Bianculli administered a left sacroiliac joint injection. (R. 447.)

14

In May 2016, Plaintiff treated with P.A. Gentile for a routine follow-up, who assessed cervicalgia and cervical radiculopathy. (R. 430-31.) She then saw Dr. Cardinale on May 17, 2016 and was given a cervical epidural steroid injection. (R. 433.) During a follow-up with Dr. Cardinale in June 2016, Plaintiff rated her pain an eight out of ten. (R. 435.) His assessment varied from P.A. Gentile's to the extent that Dr. Cardinale also noted that Plaintiff had chronic migraines and that Plaintiff reported 75% relief from radicular pain after receiving an injection. (R. 437.) To help her migraines, Dr. Cardinale prescribed Botox injections. (R. 437.)

Plaintiff then presented to Dr. Ramin Rak, M.D., for a neurosurgical opinion regarding her lumbar and cervical disc disease. (R. 470.) Dr. Rak noted that Plaintiff tried multiple conservative pain management routes but her symptoms continued to worsen and significantly affect her life. (R. 470.) More specifically, he indicated that Plaintiff had difficulty sitting in the examination chair, walking, sleeping, and taking care of her daughter. (R. 470.) After examining Plaintiff, Dr. Rak opined that Plaintiff needed surgical intervention and would benefit most likely from a posterior lumbar interbody fusion and decompression and instrumentation at L4-5. (R. 471.) He ordered updated MRIs of Plaintiff's cervical and lumbar spine, reviewed the findings with Plaintiff, and discussed surgery with her, to which Plaintiff

15

agreed.  (R. 472.)  Dr. Rak performed surgery on September 12, 2016 and Plaintiff underwent a lumbar laminotomy decompression, L4-5 discectomy, and L4-5 interbody fusion with spinal instrumentation, autograft, and allograft fusion.  (R. 460.)

During a post-operative follow-up on September 22, 2016, Plaintiff reported improvement in her leg pain but complained of incisional back pain.  (R. 463.)  She also had neck and arm pain as well as numbness in her hands.  (R. 463.)  Plaintiff was ambulating with a walker for safety but denied any weakness, numbness, or tingling.  (R. 463.)  Several weeks later in October 2016, Plaintiff had another post-operative visit with Dr. Rak, who indicated that Plaintiff "look[ed] great and . . . ha[d] recovered very well from the operation." (R. 463.)  For safety, Plaintiff was using a cane for ambulation and was grossly nonfocal.  (R. 464.)  Her incision was completely healed and she was not experiencing any weakness or numbness; however, Plaintiff still complained of occasional pain down the left leg.  (R. 464.)  Dr. Rak advised Plaintiff to wear a back brace for a total of eight weeks following her operation and indicated he would see her again in December.

In the interim, on October 27, 2016, Plaintiff saw Dr. Cardinale.  (R. 500.)  She reported neck pain at an eight out of ten and radiating pain in both of her arms.  (R. 500.)  Upon examination, Plaintiff exhibited spasms and tenderness of the left

paracervical muscles, and diminished range of motion of the cervical spine in all planes. (R. 501.) Dr. Cardinale ordered repeat cervical epidural steroid injections. (R. 502.) When Plaintiff returned for a follow-up with Dr. Rak in December 2016, she reported that she "feels better and better every day and she is continu[ing] with physiotherapy as outpatient." She was experiencing some tingling in her buttocks and in her toes, which Dr. Rak indicated is expected at this stage post-operation. (R. 478.) In addition, Dr. Rak noted Plaintiff's cervical spine issues and the fact that they planned to address those issues after Plaintiff recovered from the lumbar surgery. (R. 478.) Plaintiff complained of neck pain, headaches, shoulder pain, and tingling and numbness down her arms. (R. 478.) Thus, Dr. Rak advised Plaintiff to avoid heavy lifting, pulling, or pushing and indicated they would discuss how to manage her cervical spine issues during their next follow-up, which was in February 2017. (R. 466, 478.) At that follow-up, Dr. Rak reviewed a new MRI scan of Plaintiff's cervical spine because her neck pain, headaches, tingling, and numbness were worsening and significantly affecting her life. (R. 466.) Her symptoms of radiculopathy on the bilateral upper extremities were moderate to severe, with worse pain on the left side. (R. 466.) Plaintiff was unable to perform daily routine activities or even take care of herself, including her hygiene. (R. 466.) A review of the new MRI scan showed worsening of

17

Plaintiff's degenerative disc disease at C4-5 and C5-6, with reversal of normal lordosis as well as spinal canal stenosis and foraminal stenosis.  As such, Dr. Rak recommended surgery since Plaintiff exhausted all conservative courses of treatment.  (R. 466.)

On March 21, 2017, Dr. Rak performed an anterior cervical discectomy at C4-5 and C5-6, anterior cervical fusion at the same levels with autograft an allograft, and anterior cervical plating instrumentation from C4 to C6.  (R. 467.)  During a post-operative follow-up on March 30, 2017, Plaintiff reported lessening of her neck pain, headaches, tingling and numbness.  (R. 483.)  She experienced neck muscle spasms only at night while wearing a cervical collar.  (R. 483.)  Her incision healed and Dr. Rak observed improvements in neurological radiculopathy of both upper extremities and hands, as well as full range of motion of the neck. (R. 483.)  Dr. Rak instructed Plaintiff to wear a soft neck collar at night, to discontinue oxycodone but to continue ibuprofen and Flexeril, and to start physical therapy.  (R. 483.)  Plaintiff returned to Dr. Rak on April 6 and 27, 2017, and reported that she was doing well.  (R. 484-85.)  She denied neck pain, numbness, tingling, and weakness during both visits.  (R. 484-85.)

Over the following months, Plaintiffs' symptoms returned.  In May 2017, Plaintiff visited with Dr. Cardinale and complained of pain in her lower back that radiated into the left

arm and leg.  (R. 496.)  Upon examination, Dr. Cardinale found that Plaintiff's neck and back had diminished range of motion in all planes. (R. 497.)  He assessed chronic migraines, cervicalgia, lumbago, and myalgia.  (R. 497.)  He prescribed Tramadol and Skelaxin, administered a Botox injection to treat Plaintiff's migraines, and recommended that Plaintiff continue home exercises and physical therapy.  (R. 498.)  Dr. Cardinale assessed migraines again on June 9, 2017, administered another Botox injection, and prescribed Duexis.  (R. 494-95.)

On June 19, 2017, Plaintiff treated with Dr. Porges, to whom she complained that her entire body hurt, that she could barely walk in the morning, and that she could not sleep.  (R. 535.)  On examination, she had no tenderness, swelling, or synovitis of the hands or fingers. (R. 538.)  She had full range of motion in her wrists, shoulders, hips, and ankles but had tenderness in both knees.  (R. 537-38.)  Dr. Porges assessed fibromyalgia with diffuse pain syndrome, and prescribed a trial of Elavil, as well as Motrin. (R. 541.)

Plaintiff returned to Dr. Rak's office on June 29, 2017, and was examined by his P.A., Jinali Zaveri.  (R. 486.)  Plaintiff complained of a mild headache, throbbing back pain, and toe numbness; however, she was able to maintain her daily routine. (R. 486.)  P.A. Zaveri noted that Plaintiff was "doing well" after the operation with Dr. Rak and that she would follow-up with him

19

after having new MRIs taken.  (R. 486.)  Plaintiff then saw Dr.
Rak in August 2017 who stated that her new MRI studies showed
"complete decompression at the surgical site[s] on the cervical
spine as well as lumbar spine." (R. 487.)  Dr. Rak also reported
that "there are good alignments and nerve decompressions and spinal
cord compressions at the surgical levels." (R. 487.)  He noted
that Plaintiff had occasional tingling in her fingers, headaches,
and blurry vision, which Dr. Rak attributed to Plaintiff's
migraines.  (R. 487.)  As such, he referred Plaintiff to a
neurologist but noted that he is otherwise "pleased with her
outcome and recovery." (R. 487.)

        Plaintiff then saw Dr. Cardinale on September 27, 2017
and reported a seven out of ten pain level in her low back, neck,
and head; the pain was radiating into both arms and her left leg.
(R. 488.)  After examining Plaintiff, Dr. Cardinale noted that
she had bilateral trapezial and paracervical spasms, diminished
range of motion in her neck, and a positive left Spurling test.
(R. 489.)  He assessed myalgia, prescribed Skelaxin, Zanaflex,
Gabapentin and Duexis, and administered a trigger point injection
at C7-T1.  (R. 490-92.)

        On October 23, 2017, Plaintiff returned to her
neurologist, Dr. Soni.  (R. 519.)  Dr. Soni found that Plaintiff
was guarding her cervical paraspinal muscle, rated her power as a
4 out of 5, and noted that Plaintiff had normal gait.  (R. 519.)

She diagnosed Plaintiff with cervical radiculopathy and headaches, prescribed Tizandine, and recommended that Plaintiff continue using Botox for pain management.  (R. 519.)

In November 2017, Plaintiff visited with Dr. Porges and complained of ongoing diffuse pain, pain and tenderness all over her body, and depression.  (R. 542.)   Plaintiff also felt that she was poorly responding to multiple medications.  (R. 542.)  In his examination, Dr. Porges found that Plaintiff had tenderness in her spine, was flushed and tearful, and had full range of motion in her wrists, shoulders, hips, and ankles.  (R. 544.)  He assessed fibromyalgia and prescribed Tramadol and Elavil.  (R. 548.)

Plaintiff followed up with Dr. Cardinale on February 7, 2018, complaining of pain in her lower back and head with associated numbness, tingling, weakness, and pins and needles sensations.  (R. 527.)  Dr. Cardinale stated that her condition was getting worse but that her pain was alleviated with medication and heat.  (R. 528.)   He found bilateral trapezial, cervical, paraspinal, and lumbar paraspinal spasms and tenderness.  (R. 528-29.)  He also found that Plaintiff had a diminished range of motion in her cervical spine.  (R. 528.)   Dr. Cardinale assessed radiculopathy of the cervical region, cervicalgia, myalgia, and chronic pain disorder.  (R. 529.)  He requested that Plaintiff undergo another MRI scan, renewed her medication, including Botox, and administered trigger point injections.  (R. 529.)   The

21

resulting MRI of Plaintiff's cervical spine, which was conducted on February 13, 2018, showed no acute process or significant interval change, straightening of the normal cervical lordosis, and mild disc protrusion at C3-4. (R. 524.)  The MRI of Plaintiff's thoracic spine, which was conducted that same day, showed mild thickening of ligamentum flavum in the lower thoracic spine, without evidence of significant spinal canal stenosis. (R. 526.)

Last, on March 8, 2018, Plaintiff returned to Dr. Porges. (R. 548.)  She complained of ongoing diffuse pain, difficulty using her hands, and pain in her neck, back and joints. (R. 548.)  Dr. Porges reported no remarkable findings in his musculoskeletal examination, noting normal curvature and motion of the cervical, thoracic and lumbar spines, and no tenderness or loss of motion in the extremities or joints. (R. 551.)  He assessed chronic diffuse pain, "probably mechanical with fibromyalgia type pain," prescribed Tramadol, and referred Plaintiff to a spine specialist. (R. 555.)

   C.   Opinion Evidence

There is opinion evidence from Dr. Checo, Dr. Rak, Dr. Cardinale and Dr. Porges, four of Plaintiff's treating physicians, as well as Dr. Syeda Asad, M.D., who performed a consultative examination upon the Commissioner's request.

Dr. Checo completed a residual functional assessment form dated November 6, 2015. (R. 347.)  He indicated that

Plaintiff could sit and stand for five minutes at a time and for less than two hours in an eight-hour work day.  (R. 347.)  He also marked that Plaintiff could occasionally lift less than 10 pounds but could never reach, feel, bend, stoop, crawl, handle, push/pull, climb, kneel, or squat.  (R. 347.)

Dr. Asad examined Plaintiff on February 1, 2016. (R. 412.)  Plaintiff's chief complaints at that time were neck pain, low back pain, and migraines.  (R. 412.)  She told Dr. Asad that her pain has worsened over time, since the July 2015 accident, and that the multiple epidural cortisone shots she received in the upper neck and low back did not help.  (R. 412.)  She described her neck pain as throbbing, radiating into the bilateral upper extremities and associated with numbness and tingling into the fingers on both hands.  (R. 412.)  Plaintiff's low back pain was sharp and radiating into both lower extremities, although more prominently in the left leg.  (R. 412.)  She rated her pain as eight out of ten in intensity.  (R. 412.)  Upon conducting a physical examination, Dr. Asad noted that Plaintiff did not appear to be in acute distress but with a slightly slow gait.  (R. 412.) Plaintiff had a normal stance and refused to squat or walk on her heels and toes.  She needed no help getting on and off the exam table and was able to rise from her chair with minimal difficulty. (R. 412-13.)  Dr. Asad also reported that Plaintiff's cervical spine showed flexion and extension to 30 degrees, rotation of 40

23

degrees bilaterally, and lateral flexion 30 degrees bilaterally. (R. 414.)   Plaintiff's thoracic spine showed no scoliosis, kyphosis, or abnormalities.  (R. 414.)  Plaintiff's lumbar spine showed flexion and extension to 30 degrees, lateral flexion of 15 degrees bilaterally, and rotation of 15 degrees bilaterally. Plaintiff's shoulders had forward elevation of 40 degrees and she had full range of motion of her elbows, forearms, and wrists bilaterally.  As to her hips, flexion and extension was 50 degrees and backward extension was 15 degrees.   Range of motion of Plaintiff's knees was 75 degrees, and she had full range of motion in her ankles.  Dr. Asad noted that Plaintiff had no sensory deficits and rated Plaintiff's strength as five out of five in both her upper and lower extremities.  She also indicated Plaintiff's hand and finger dexterity was intact and that Plaintiff's grip strength was rated five out of five in both hands. Dr. Asad opined that due to Plaintiff's back pain, she had "moderate limitations for squatting, kneeling, bending, walking, and standing for a long period of time" and "moderate limitations for lifting, carrying, or pushing any objects."  (R. 415.)

Dr. Rak completed a "Spinal Impairment Questionnaire" on February 2, 2017.  (R. 453-59.)   After noting that he began treating Plaintiff on July 21, 2016, he stated Plaintiff's diagnosis as lumbar and cervical spine degenerative disc disease and indicated this condition was chronic and long-term.  (R. 453.)

The clinical findings he based this diagnosis upon were Plaintiff's abnormal gait; limited range of motion; tenderness; muscle spasm; sensory loss; reflex changes; muscle atrophy; and muscle weakness in the cervical and lumbar spine. (R. 454.) He also noted that Plaintiff had constant headaches and pain in her back, neck, and hands. (R. 455.) In assessing Plaintiff's residual functional capacity ("RFC"), Dr. Rak opined that, in an eight-hour work environment, Plaintiff could sit, stand, and walk for up to one hour. (R. 456.) He also recommended that Plaintiff not continuously sit, stand or walk, and that she must get up and move around every 30 to 40 minutes. (R. 456.) Dr. Rak noted that Plaintiff was capable of tolerating low work stress and that she could occasionally lift and carry between zero and 10 pounds but never any weight in excess of that amount. (R. 457.) He believed Plaintiff's condition would: require her to take unscheduled breaks; interfere with her ability to keep her neck in a constant position; and cause her to be absent from work for treatment more than three times per month. (R. 458.) He noted additional limitations that would affect Plaintiff's ability to work regularly such as her need to avoid noise, heights, pulling, pushing, kneeling, bending, and stopping. (R. 459.) In sum, he stated Plaintiff was "unable to work." (R. 457.)

Dr. Cardinale completed a "Multiple Impairment Questionnaire" on November 14, 2017. (R. 504-11.) He indicated

that he began treating Plaintiff on a monthly basis on May 9, 2013.
(R. 504.)   He diagnosed Plaintiff with myalgia and cervicalgia,
and noted Plaintiff's lumbar spinal fusion.   (R. 504.)   He
identified positive clinical findings to support his diagnosis,
including palpation of the cervical spine; bilateral trapezial
spasm; bilateral paracervical spasm and tenderness; diminished
range of motion in all planes; and a positive Spurling's test.
(R. 504.)   Plaintiff's pain was noted as constant, radiating,
shooting and throbbing in her left leg above the knee, as well as
in both arms above the elbow.   (R. 505-06.)   He noted the level of
pain was an 8 out of 10, and exacerbated by stretching, standing,
sitting, twisting, walking, bending, extending, lifting, and
laying in bed.   (R. 505-06.)   Regarding Plaintiff's RFC, Dr.
Cardinale opined that Plaintiff could sit for 30 minutes, and stand
and walk for 15 minutes in an eight-hour work day.   Further, she
must get up and move around every 15 minutes, and not stand or
walk continuously.   (R. 506-07.)   She could occasionally lift and
carry less than five pounds but could never exceed that amount.
(R. 507.)   Plaintiff had significant limitations in doing
repetitive reaching, handling, fingering, or lifting, and had
marked limitations with respect to the use of both hands.   (R.
507-08.)   He opined that Plaintiff is totally disabled, could not
do a full-time competitive job that required activity on a

sustained basis, and that her symptoms would likely increase if
she was placed in such a work environment.  (R. 508-09.)

Last, Dr. Porges completed a "Fibromyalgia Impairment
Questionnaire" on November 22, 2017.  (R. 512-17.)  He noted that
he began treating Plaintiff in April 2016 and saw her every three
to four months.  (R. 512.)  He identified Plaintiff as having
constant pain at a level of 9 out of 10 in her lumbar and cervical
spine, and in the bilateral shoulders, arms, hands/fingers, hips,
legs, knees, ankles, and feet.  (R. 513-14.)  As to Plaintiff's
work limitations, Dr. Porges opined that Plaintiff could sit for
two hours on a non-continuous basis and stand/walk for less than
one hour.  (R. 514.)  He also indicated Plaintiff could
occasionally lift and carry less than five pounds, would need to
take unscheduled breaks, and miss work more than three times per
month.  (R. 515-16.)

D.   Vocational Expert's Testimony

At the hearing, Srinivasan, the VE, testified that
Plaintiff worked as a real estate appraiser which was classified
as light and skilled work.  (R. 48.)  The VE then considered a
hypothetical individual with Plaintiff's vocational profile who
was limited to light work, occasional climbing of ramps and stairs,
and occasional balancing, stooping, kneeling, crouching or
crawling; prohibited from climbing ladders, ropes or scaffolding
and from reaching overhead; limited to "frequent handling,

27

fingering and feeling"; and needed to avoid excessive noise, bright lights, slippery and uneven surfaces, hazardous machinery, unprotected heights, and open flames.   (R. 48.)  With these limitations in mind, the VE opined that this individual could perform Plaintiff's past work, as well as the work of a cashier, merchandise marker, and storage facility rental clerk.   (R. 48-49.)  The ALJ modified the hypothetical to provide for a sedentary exertional level but kept all of the other limitations in place, and the VE testified that the individual could not perform Plaintiff's past work but could be a document specialist, addresser, or charge account clerk.  (R. 49.)  However, if such a person were to be regularly absent from work more than once per month and/or be off task more than 10% of the day outside of regularly scheduled breaks, the VE stated the person would not be able to maintain competitive employment.  (R. 50.)  In addition, if two-hour limitations for sitting and standing/walking, lifting no more than five pounds, or occasional handling and fingering were added to the hypotheticals, the VE indicated that under each of those scenarios, the individual would be unable to perform the light or sedentary work previously described.  (R. 50-51.)

<u>DISCUSSION</u>

I.   <u>Standard of Review</u>

         In reviewing the ruling of an ALJ, the Court does not determine <u>de novo</u> whether the plaintiff is entitled to disability

benefits.   Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Colgan v. Kijakazi, No. 20-CV-3297, 2022 WL 18502, at *3 (2d Cir. Jan. 3, 2022); see also Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Put otherwise "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

II.   The ALJ's Decision

Initially, the ALJ found that Plaintiff meets the insured-status requirements of her claim through June 30, 2020. (R. 13.)  Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from July 13, 2015, the alleged disability-onset date, through July 30, 2018, the date of the ALJ's decision.  (R. 13-21.); see also 20 C.F.R. § 404.1520.  At steps one through three, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset date (R. 13.); (2) Plaintiff had severe impairments of degenerative disc disease in the cervical and lumbar spines status post-fusion and fibromyalgia (R. 13.); and (3) Plaintiff's impairments did not meet, or medically equal, the

severity of any of the impairments listed in Appendix 1 of the Social Security regulations (R. 14.)

The ALJ then determined that Plaintiff had the RFC to perform sedentary work, albeit with the following limitations: be prohibited from climbing ladders, ropes, and scaffolds; could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; be prohibited from reaching bilaterally overhead; limited to frequent handling, fingering, and feeling bilaterally; required to avoid concentrated exposure to excessive noise and bright lights; and required to avoid slippery and uneven surfaces, and hazardous machinery, unprotected heights, and open flames. (R. 14.)  To support this RFC determination, the ALJ first summarized Plaintiff's hearing testimony.  (R. 15.)  He observed that Plaintiff testified she stopped working when she was involved in an accident and that she is unable to work because she cannot sit or stand for long; her neck gives her the most pain, which pain travels to arms, hands, and fingers; her neck pain worsened after the fusion but medications help; she did not go to physical therapy due to lack of  insurance coverage although she testified that she had insurance through her husband and she performed physical therapy at home which provided her relief.  (R. 15.)  The ALJ was not persuaded by Plaintiff's "subjective allegations that treatment did not effectively manage the alleged symptoms."  (R. 15.)

Next, the ALJ turned to the Function Report that Plaintiff submitted in connection with her disability claim, (R. 15, 180-87), and reflects that Plaintiff cannot lift anything overhead, sit for more than 10 minutes, or stand or walk for more than three minutes.  (R. 15.)  However, Plaintiff testified that she could lift less than five pounds, walk two blocks, and stand for 20 minutes on a good day but only 10 minutes on a bad day, which the ALJ found inconsistent with the three-minute standing and walking limitations in the Report.  (R. 15.)  The Report also indicated that Plaintiff could not climb more than two stairs, she needed help with cleaning and laundry, and that her daughter helped her put on pants.  (R. 15.)  The ALJ also found these reported abilities inconsistent with the alleged degree of severity.  (R. 15.)  Plaintiff testified that she was able to shower, and in the Report, indicated she was able to prepare quick meals on a daily basis and shop in stores for food.  (R. 15.)  The ALJ also pointed to Dr. Asad's examination of Plaintiff, during which Plaintiff indicated she could perform light cleaning, laundry, and shop with assistance, finding this contradictory to Plaintiff's testimony which provided that her husband and daughter performed those tasks. (R. 15, 413.)  Moreover, Plaintiff testified that she drove to pick up her medications and that she flew to Florida in February 2018, which would involve sitting, standing, and walking for extended periods.

31

The ALJ then reviewed the medical evidence and determined that the objective findings failed to support the alleged extent of Plaintiff's symptoms and limiting effects. (R. 15-16.)  To begin, the ALJ noted that Plaintiff went to the emergency room after being involved in a car accident in July 2015 but was discharged that same day in improved condition.  (R. 16.) The orthopedic evidence from that month showed tenderness to palpation of the cervical spine, pain with range of motion in the cervical and lumbar spine, and positive Spurling's test results, but that Plaintiff maintained full strength of the upper extremities.  (R. 16.)  The ALJ found the July 2015 cervical spine MRI that showed mild degenerative change to be inconsistent with the alleged degree of severity of Plaintiff's neck symptoms.  The August 2015 lumbar spine MRI showed straightening but no interval change of the disc herniation.  (R. 16.)  The September and October 2015 records showed diminished range of motion of the cervical and lumbar spine and mild gait, but that Plaintiff maintained full strength of the extremities.  (R. 16.)  The November 2015 records contained no evidence of cervical or lumbar radiculopathy "which shows that the alleged symptoms did not radiate as alleged."  (R. 16.)  Moreover, the November and December 2015 records showed pain and tightness and that Plaintiff maintained full strength of the upper extremities, which the ALJ found consistent with the records

from February 2016 since they collectively demonstrated that Plaintiff's symptoms were not as limiting as alleged.  (R. 116.)

The medical imaging from January and April 2016 showed straightening and disc bulge in the lumbar spine, disc ridge complexes and reversal of the curvature in the cervical spine, severe spondylosis in the cervical spine, and mild disc herniation. (R. 16.)  However, the records from March, April and June of that year showed normal gait despite tenderness, as well as decreased range of motion, but that Plaintiff was not in pain.  (R. 16.) Again, this led the ALJ to the conclusion that the evidence supports the existence of Plaintiff's symptoms but not the extent of their limiting effects.  (R. 16.)

The ALJ then addressed the injections and surgical intervention Plaintiff underwent.  (R. 16.)  He noted that Plaintiff received injections for cervical spine symptoms in August 2015, October 2015, and May 2016, then underwent a lumbar fusion in September 2016.  (R. 16.)  Plaintiff then received another injection in October 2016 and, in December 2016, reported feeling better each day after the fusion.  (R. 16.)  However, Plaintiff reported that her cervical spine symptoms continued and underwent a cervical fusion in March 2017.  (R. 16.)  She reported "doing great" as of June 2017 and, during a follow-up in August 2017, showed good alignment and complete decompression.  (R. 17.) Plaintiff also received more trigger point injections in September

2017 and February 2018.   (R. 17.)   This evidence of reported improvement, according to the ALJ, was contrary to Plaintiff's testimony that the fusions did not help, and was reasonably consistent with the specialized treatment findings.  (R. 17.)  The May and June 2017 records showed diminished range of motion in the cervical and lumbar spine, and the September 2017 evidence showed diminished range of motion in the neck.   (R. 17.)   However, Plaintiff maintained a normal gait as of October 2017 which the ALJ found demonstrative of the fact that Plaintiff's ability to ambulate was not significantly limited.   (R. 17.)   Moreover, although the February 2018 evidence continued to show diminished range of motion of the cervical spine and spasms of the lumbar spine, the medical images taken that same month showed no significant changes or that Plaintiff's condition was deteriorating.  (R. 17.)

The ALJ also found that the record did not support Plaintiff's claimed severity of fibromyalgia.  (R. 17.)  As of April 2016, the record showed the rheumatoid factor was 13 and the initial rheumatology consultation evidence showed a marked decrease range of motion of the lumbar.  (R. 17.)  However, the only tender points identified were in the elbow and shoulders which did not indicate that the fibromyalgia was wide-spread throughout Plaintiff's body.  (R. 17.)  Similarly, the June 2017 rheumatology evidence showed tenderness of the knees, but not in the hands; the

34

November 2017 records showed tenderness of the knees spine, and hands; but the February 2018 documentation showed normal findings of the musculoskeletal system, including full range of motion and no tenderness.  (R. 17.)

Next, the ALJ considered the opinion evidence.  He assigned limited, little, or very little weight to each of the four opinions provided by Dr. Checo, Dr. Rak, Dr. Cardinale, and Dr. Porges, all with whom Plaintiff had a treatment relationship. (R. 17-19.)  As to Dr. Checo, Dr. Rak, and Dr. Cardinale, the ALJ found that their opinions were not consistent with the evidence, including Plaintiff's "reported and demonstrated abilities as well as the evidence of improvement."  (R. 17-18.)  Then, as to Dr. Porges, the ALJ found that his opinion was "inconsistent with the evidence throughout the record, including [his] own findings." (R. 18.)  Last, the ALJ considered the findings by Dr. Asad and assigned some weight to her opinion, which prescribed moderate limitations on Plaintiff's abilities despite the opinion being based upon a one-time examination.  (R. 19.)

Turning to step four of the disability analysis, the ALJ found Plaintiff was not capable of performing any past relevant work, consistent with the VE's testimony.  (R. 19.)  Nevertheless, at the final, fifth next step, the ALJ concluded that "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform." (R. 19.) Accordingly, the ALJ determined that Plaintiff is not disabled. (R. 20.)

III. <u>Analysis</u>

Plaintiff's primary argument is that the ALJ weighed the opinion evidence by Dr. Checo, Dr. Rak, Dr. Cardinale, and Dr. Porges in violation of the treating physician rule which renders the ALJ's RFC determination unsupported by the record. (Pl. Support Memo at 1.) The Commissioner contends that the ALJ properly declined to afford controlling weight to these opinions and that the ALJ's RFC findings are supported by substantial evidence. (Comm'r Support Memo at 25-33.)

A.   <u>The Treating Physician Rule</u>[3]

The "treating physician rule" provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998). The regulations state:

> Generally, we give more weight to medical opinions from your treating sources . . . . If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) <u>is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial</u>

---

[3] "[T]he Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect." <u>Williams v. Colvin</u>, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017).

> evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 404.1527(c)(2) (emphasis supplied; second and third alterations in original).   Thus, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted).

When an ALJ does not afford controlling weight to the opinion of a treating physician, the ALJ must consider several factors:

> (1) the length of the treatment relationship
> and frequency of the examination; (2) the
> nature and extent of the treatment
> relationship; (3) the extent to which the
> opinion is supported by medical and laboratory
> findings; (4) the physician's consistency
> with the record as a whole; and (5) whether
> the physician is a specialist.

Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). The ALJ must also set forth "'good reasons' for not crediting the opinion of a [plaintiff's] treating physician." Id. at 287.   An ALJ provides "'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician

rule, he nonetheless stated that [the physician's] opinion . . . was contradictory to the rest of the record evidence."). "Ultimately, an ALJ must comprehensively set forth her reasons for the weight assigned to a treating physician's opinion." Id. (internal quotation marks and citation omitted).

B. Application

In explaining his decision to afford Plaintiff's treating physicians' opinions less than controlling weight, the ALJ generally stated that the opinions were not consistent with the evidence in the record due to Plaintiff's "reported and demonstrated abilities" as well as her "reported improvement." To support these inferences as to each physician's opinion, the ALJ provided the same string citation to a laundry list of exhibits without any elaboration regarding the exhibits and their significance, i.e., what within the exhibits rendered the opinions inconsistent. (See R. 17-19.) As such, it is not clear to the Court why the records cited by the ALJ formed the bases of his assessments of the physicians' opinions. Despite the fact that all of the treating physicians' opinions were consistent with each other, yet deemed non-controlling, it is also not apparent why some were seemingly afforded more weight than others, e.g., why the opinions of Dr. Checo and Dr. Rak were afforded "limited weight" whereas Dr. Cardinale's opinion was assigned "little weight" and Dr. Porges' opinion was given "very little weight."

See Maneri v. Berryhill, No. 17-CV-322, 2019 WL 4253972, at *5 (E.D.N.Y. Sept. 9, 2019) ("Although the Court is generally required to defer to the medical opinion of a treating physician, see Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993), those findings may not be accorded controlling weight if they are inconsistent with other substantial evidence, including the opinions of other medical experts." (citation omitted)).  This constitutes error requiring remand because the ALJ's lack of particularity frustrates the Court's review of the weight afforded to these opinions.  See Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) ("Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." (emphasis added) (citing Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001))); Colon Medina v. Comm'r of Soc. Sec., 351 F. Supp. 3d 295, 303 (W.D.N.Y. 2018) ("Because the ALJ's reasoning for rejecting several opinions in the record is abundantly unclear to the Court, the matter must be remanded for further proceedings.").

The Court further observes that, based upon the portion of the ALJ's decision which reviews the record evidence, it appears the information that the ALJ utilized to discredit the treating physicians' opinions consisted of Plaintiff's stated abilities to walk two blocks, shower, "prepare quick meals on a daily basis,"

shop in stores for food with or without assistance, perform light cleaning, do laundry, do physical therapy at home, drive to pick-up medication, and travel to Florida by plane.  (R. 15.)  In addition, the ALJ referred to Plaintiff's reported improvement after receiving injections and undergoing both a lumbar fusion and a cervical fusion.  (R. 16.)  However, the Court does not find any of these rationales to be "good reasons" to discount the physicians' opinions.

First, to the extent the ALJ relied upon evidence of Plaintiff's daily activities described above, the Court does not view these abilities to be inconsistent with the limitations prescribed by the treating physicians in their opinions.  See McCleese v. Saul, No. 18-CV-4494, 2019 WL 3037308, at *12–13 (S.D.N.Y. June 26, 2019) ("As for daily activities, the ALJ cited to evidence in the record that McCleese engaged in shopping, exercising, light cooking, watching television, reading and socializing with friends, which he found indicated a 'higher level of functionality' than Dr. Polifrone's opinions allowed.  However, McCleese's ability to engage in certain daily activities on a limited basis is not inconsistent with the limitations described by Dr. Polifrone." (internal citation omitted)), report & recommendation adopted sub nom., 2019 WL 3034892 (S.D.N.Y. July 11, 2019); see also Cabrera v. Comm'r of Soc. Sec., No. 16-CV-4311, 2017 WL 3686760, at *4 (S.D.N.Y. Aug. 25, 2017) (holding

40

ALJ's rejection of treating physician opinion improper where the opinion was discredited as "not consistent with the claimant's own reported retained capacity to perform activities of daily living despite her severe physical impairments" because "[c]ourts have found statements of this sort to be too conclusory to constitute 'good reasons' for not assigning a treating doctor's opinion controlling weight"). "The ALJ had an obligation to better explain his decision to discount [the treating physicians'] opinion[s] based on [Plaintiff's] alleged ability to perform daily activities, and to at least acknowledge the rigor of [Plaintiff's] daily activities and the limitations she placed on those tasks." Cabrera, 2017 WL 3686760, at *4 (citing Archambault v. Astrue, No. 09-CV-6363, 2010 WL 5829378, at *30 (S.D.N.Y. Dec. 13, 2010), report & recommendation adopted, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011)); see also Lawrence v. Comm'r of Soc. Sec., No. 18-CV-12317, 2020 WL 8815492, at *1 (S.D.N.Y. June 10, 2020) ("[T]he Court finds that the ALJ's reliance on Lawrence's purported daily activities and conservative treatment are not good reasons to assign little weight to Dr. McNulty's opinions as to Lawrence's functional abilities.  Notably, the ALJ's characterization of Lawrence's reported daily activities is flawed.  The ALJ stated that Lawrence could drive, go out alone, put clothing into a washing machine, do some cooking and go to the store, but in the function report the ALJ cites Lawrence describes significant limitations on these

41

activities. . . . Moreover, the activities described do not undermine Dr. McNulty's assessment of Lawrence's work-related functions." (citations omitted)), report & recommendation adopted, 2020 WL 8815488 (S.D.N.Y. June 29, 2020).

Moreover, although the Court understands why the ALJ would question Plaintiff's stated inability to sit for extended periods of time because she flew to Florida, the Court does not find this single isolated event to be in conflict with Plaintiff's work-related limitations assessed by her treating physicians because those assessments were based upon Plaintiff's ability to perform certain activities for purposes of working eight hours a day, five days per week. See Cummings v. Comm'r of Soc. Sec., No. 18-CV-0187, 2020 WL 5045038, at *6 (W.D.N.Y. Aug. 26, 2020) ("[T]he ALJ's rejection of Dr. Bassig's opinion based on its inconsistency with Plaintiff's own testimony about her travel to California prior to the hearing was not justified. Even though the ALJ has discretion to resolve conflicts in the record, including those related to a claimant's activities of daily living, see Perozzi v. Berryhill, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018), the claimant's daily activities alone cannot constitute substantial evidence. In fact, a claimant's ability to function on a daily basis in a restrictive and isolated setting has been found to be insufficient to determine the claimant's employability . . . . Here, Plaintiff's isolated short trip to California where she first flew

on a plane and then was a passenger in the car while her niece drove them along the Pacific Coast Highway was insufficient to discount the findings of Dr. Bassig's regarding Plaintiff's work-related limitations." (citations omitted)).

Last, the Court is not convinced that "the evidence of improvement" cited by the ALJ is sufficient grounds to reject the treating physicians' opinions. (R. 16-17.) The ALJ noted that after receiving several trigger point injections, Plaintiff underwent a lumbar fusion in September 2016, received another injection in October 2016, underwent a cervical fusion in March 2017, and received additional injections in September 2017 and February 2018. (R. 16-17.) Pertinent here, the ALJ noted that in December 2016, Plaintiff reported feeling better each day following the lumbar fusion and that in March 2017, she felt great after the cervical fusion. (R. 16.) The ALJ then found this "evidence of improvement . . . reasonably consistent with the specialized treatment findings." (R. 17.) Yet, after reviewing further orthopedic evidence from May to September 2017, which showed Plaintiff had diminished range of motion of the spine and neck following surgical intervention, the ALJ found that February 2018 MRI scans of Plaintiff's spine "show[] that her condition was not deteriorating despite her subjective allegations" to the contrary. (R. 17.) Even if that were so, neither did those scans evince any improvement; at most, they were neutral and certainly

43

not enough to disregard the opinions of Plaintiff's treating physicians.

In sum, the ALJ essentially indicates that the treating physicians' opinions concerning the severity of Plaintiff's degenerative disc disease were based upon Plaintiff's subjective complaints of pain, which are not supported by the record evidence. And to reconcile this determination, the ALJ erroneously inserted his own opinion as to the implications of Plaintiff's MRI scans. "It is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.'" Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (alterations in original) (citing McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir.1983)).

Thus, the Court finds that the ALJ violated the treating physician rule, thereby warranting remand.  On remand, the ALJ will need to reevaluate the weight he accorded to Plaintiff's treating physicians' opinions.  This is particularly so where these four physicians reached consistent conclusions, and the ALJ provided inadequate explanations for discrediting their opinions in addition to critiquing those opinions based upon his own

judgment.  If any of these opinions are given controlling weight on remand, there is a substantial likelihood that the ALJ's conclusion that Plaintiff is able to perform sedentary work will be reversed.  In particular, Drs. Checo, Cardinale, Porges, and Rak all opined that Plaintiff's ability to sit is extremely limited, and according to the VE's hearing testimony, Plaintiff would be unable to perform the sedentary jobs identified by the ALJ in his decision if Plaintiff could not sit for two hours in a given workday.

In light of these findings, the Court need not consider the parties' remaining contentions, which they are free to address on remand.

<u>CONCLUSION</u>

For the stated reasons, **IT IS HEREBY ORDERED that** Plaintiff's motion (ECF No. 8) is GRANTED and the Commissioner's motion (ECF No. 13) is DENIED.  This matter is REMANDED for proceedings consistent with this Memorandum and Order.  The Clerk of the Court is directed enter judgment accordingly and to mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March 28, 2022
       Central Islip, New York